UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :     Chapter 11

BREWERY PARK ASSOCIATES, L.P.          :

            Debtor                         :     Bankruptcy No. 10-11555


................................................

MEMORANDUM

................................................

Two related matters are presently before me.  First, a secured creditor, The

Reinvestment Fund, Inc. ("TRF"), seeks confirmation of its proposed second modified

amended chapter 11 plan.  Second, the debtor requests dismissal of this chapter 11 case.

The debtor opposes confirmation of TRF's proposed plan; TRF opposes dismissal of the

debtor's chapter 11 case.  Alternatively, TRF believes that if its chapter 11 plan is not

confirmed conversion to chapter 7 is warranted.

As for parties in interest, the City of Philadelphia, which asserts secured

claims upon all of the debtor's real property, is neutral as to confirmation versus

dismissal, but did not endorse conversion.  The United States Trustee supports dismissal

but takes no position regarding confirmation.  No other creditor or interested party

participated in the hearings on these two contested matters.


I.


With the consent of the parties, these two matters were heard over three

days on a consolidated evidentiary record.  The following material facts were proven.

A.

The debtor is a limited partnership with two limited partners: Mr. Slavko
Brkich and his wife, Mrs. Victoria Brkich. The limited partners own a 99% interest in the
debtor. The general partner, Slavko Properties II, Inc., holds the other 1% partnership
interest. See ex. D-5. Mr. Brkich is the president and sole shareholder of the general
partner. 2 N.T. at 6-7.[1]

The debtor was formed to develop a large parcel of real estate in a formerly
industrial section within Philadelphia. In 1997, the debtor purchased an entire city block
along with other neighboring properties, estimated in size at about 700,000 square feet. 2
N.T. at 36. It has since sold some of that real estate to other developers. 2 N.T. at 49-50,
52, 55.

Of the various pieces of real estate that the debtor limited partnership still
owns, the largest and most valuable property is located at 3000-3050 Master Street,
Philadelphia, Pennsylvania. Ex. D-4 (Schedule A). In addition, the debtor owns six
much smaller parcels located nearby at 2940 Master Street, 2942 Master Street, 1335
North 30th Street, 1341 North 30th Street, 1343 North 30th Street, and 1345-47 North
30th Street, Philadelphia, Pennsylvania. Id. Its bankruptcy schedules list no cash or other
personal property. Ex. TRF-12 (Schedule B). The debtor also has no present cash flow
and so no ability on its own to pay expenses, such as real estate taxes. 2 N.T. at 21-22.
Any payment of expenses in this chapter 11 case, such as property insurance, has been at

---

[1]Transcripts have been filed for the three days of the consolidated hearing.
References to those transcripts will be denoted "1 N.T. at", "2 N.T. at" and "3 N.T. at."

the discretion of an affiliated, non-debtor entity controlled by Mr. Brkich: Melon Green

Realty Group, Inc.  2 N.T. at 11.

 The debtor's real property is a portion of a former warehouse that was

constructed in 1940 for a supermarket chain.  2 N.T. at 41; ex. T-3, at 16.  The debtor has

sold a portion of the building to another developer, Pennrose Development, LLC, and

retained more than 300,000 square feet.  The debtor's portion of the building is currently

a shell in the interior, albeit with new windows and roof.  2 N.T. at 66, 68.

 It has been the debtor's intention to develop its portion of the real property

at 3000-3050 Master Street, with a total of 327,868 square feet, into a mixed-use site:

commercial use on the first floor and residential condominiums on the upper floors.  See

2 N.T. at 42, 57; ex. T-3.  To that end, it has at least 218,245 square feet of suitable area.

See ex. T-3.

 Initially, the debtor borrowed funds from Sovereign Bank, 2 N.T. at 41, but

repaid that loan in 2001 with financing from TRF.  2 N.T. at 46-47.  More recently, it has

been unable to obtain refinancing to repay its current obligation to TRF, which obligation

originated in 2006.  1 N.T. at 26.  In March 2007 the debtor signed an amended

promissory note in the amount of $4,475,000.  Ex. TRF-4 (exhibit A).  On June 28, 2008,

it signed a note modification agreement extending the loan maturity date until August 1,

2008.  Id. (exhibit B).  This promissory note and note modification were guaranteed by

Mr. and Mrs. Brkich, as well as by Melon Green Realty Group, Inc. Id. (exhibit D).  The

promissory note was secured by the debtor's interest in its numerous real properties,

including the smaller parcels.

3

When the loan to TRF was not repaid upon its maturity, and after a number of negotiated extensions, TRF confessed judgment in state court against the debtor and guarantors in March 2009 in the amount of $4,321,969.80.  Ex. TRF-4 (exhibit A); ex. D-1.  The debtor then filed a petition in state court to strike and/or open the confessed judgment in July 2009.  Ex. D-1.  With no stay of execution pending the outcome of the debtor's petition granted (see ex D-1, state court docket entries), TRF was entitled to schedule the 3000-3050 Master Street realty for sheriff sale, which sale (after a number of agreed upon postponements, see, e.g., exs. TRF-34 to 35) was to take place on March 2, 2010.  On March 1, 2010, the debtor filed the instant chapter 11 bankruptcy petition, thereby triggering the automatic stay under section 362(a).

The sheriff must have been informed immediately of the pending bankruptcy case and the automatic stay, as the execution sale did not take place.  The debtor, however, did not file a suggestion of bankruptcy with the state court.  Unaware of the debtor's bankruptcy filing, the state court on June 18, 2010 granted the debtor's motion to strike TRF's confessed judgment against it and to stay any execution.  Ex. D-2.  Upon motion of TRF and without opposition from the debtor, this bankruptcy court voided the state court's June 18th order in favor of the debtor as violative of the bankruptcy stay imposed by section 362(a).  Ex. D-3; see generally Raymark Industries, Inc. v. Lai, 973 F.2d 1125, 1132 (3d Cir. 1992); Borman v. Raymark Industries, Inc., 946 F.2d 1031, 1032 (3d Cir. 1991); Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446, 449 (3d Cir. 1982).  The debtor concedes that some amount is owing to TRF, but disputes that the amount confessed is valid.  See 2 N.T. at 23-24.

4

In its bankruptcy schedules, the debtor disclosed undisputed, liquidated, non-contingent, unsecured claims in the amount of $676,633. It also listed Ms. Eileen McAlonan as holding an undisputed, liquidated, non-contingent, secured claim in the amount of $77,500, with the collateral being all of the debtor's real estate except the large property at 3000-3050 Master Street. Ex. D-4 (Schedule D).

Meanwhile, TRF filed a secured proof of claim in the amount of $5,165,401.59. Ex. TRF-4. The City of Philadelphia filed an amended secured proof of claim in the total amount of $104,535.75 for unpaid property taxes. Ex. TRF-11. A portion of this secured claim is attributable to the large parcel and another portion attributable to taxes owed on the six smaller parcels. The debtor has not filed any objections to these two secured claims. Nonetheless, Mr. Brkich testified that the debtor was challenging the city's tax assessment through the latter's administrative process. 2 N.T. at 17, 19, 27-28.

In its bankruptcy schedules, the debtor opined that its interest in the real estate located at 3000-3050 Master Street had a value of $10,300,000, and the other properties collectively had a value of only $100,000. Ex. D-4 (Schedule A). At the hearing on these two contested matters, the debtor offered no expert testimony.

TRF introduced an appraisal report prepared by Mastroieni & Associates, a real estate appraisal and consulting firm. This appraisal valued the property as of July 9, 2010. Ex. TRF-3.

Using a comparative sales approach, and agreeing that the debtor's development plans for mixed-use residential and commercial units represent the highest and best use for the realty (although suggesting that the number of planned residential

condominium units could be increased), the appraiser valued the debtor's interest in the

realty at 3000-3050 Master Street to be a range of $7 million to $8.4 million, ex. T-3 at

38, and estimated an $8 million value as of July 2010.  Id.

At the consolidated hearing on the two contested matters, Ms. Mastroieni

testified about an "addenda" to this July 2010 appraisal report that she prepared in March

2011.  See ex. TRF-33.  Essentially, relying upon sale prices of other properties not

known to her at the time of the July 2010 appraisal, and given the lack of significant

recovery in the local real estate market, along with difficulties in obtaining financing for

real estate development, she concluded:

> Recent sales and development activity (or the lack thereof)
> suggest that the current market value has probably dropped to
> the middle of the range—say $6,000,000 to $7,000,000.  The
> most likely sale price—to induce a transaction within six to
> 12 months—could still be lower, in the range of $5,000,000 to
> $6,000,000.

Ex. TRF-33, at 4.

B.

The debtor, which presently is unwilling to voluntarily sell its undeveloped

realty, has been unable to find refinancing with which to propose a viable chapter 11 plan.

Mr. Brkich believes that he needs at least $20 million in financing to develop the realty,

and that he can obtain tax credits and refinancing if the debtor's bankruptcy case is

dismissed.  See 2 N.T. at 178; ex. D-6 (application for historic preservation tax credits);

ex. TRF-32.

6

After the debtor failed to propose a bankruptcy plan during its period of exclusivity, TRF did so.[2]  TRF's proposed second modified amended chapter 11 plan, exs. TRF-6, 7, and 8,[3] contains the following material provisions:

All administrative expenses will be paid in full on the effective date of the plan.[4]  The effective date occurs ten days after any objection to the disposition of the debtor's interest in 3000-3050 Master Street is resolved.  Payment of administrative expenses shall be made by TRF, if TRF becomes the transferee of the debtor's interest in 3000-3050 Master Street, or by the proceeds of the sale of that property paid by a third-party purchaser.

TRF's secured claim, which is placed by itself in class 2,  is allowed as asserted in its proof of claim, along with postpetition interest, late charges, and attorney's fees.  As of the date of the confirmation hearing, TRF maintained that it was owed $5,541,482.00, with a per diem rate of $1,020.30.  In its posthearing memorandum, at 19, TRF seems to accept that its postpetition interest calculation offered at the hearing, and detailed in exhibit TRF-5, was inaccurate.

---

[2]Before the confirmation hearing, TRF had filed a chapter 11 plan, an amended plan, a modification of its amended plan and a second modification of its amended plan.

[3]At my request, TRF has consolidated the three trial exhibits that comprise its proposed plan into one document titled "Second Modified Amended Chapter 11 Plan of Reorganization," docketed as entry #117.

[4]The second modified amended plan appears to remove any earlier imposed $10,000 ceiling on the amount paid to debtor's counsel as an administrative expense, although paragraph 4.5.1 retains language from an earlier proposed plan that may suggest such a ceiling. Given TRF's counsel's statement at closing argument that it was not his client's intention to still propose a ceiling on the payment of any administrative expense, if confirmation were otherwise warranted, the language of paragraph 4.5.1 could be modified by the order of confirmation.  See generally In re T-H New Orleans Ltd. Partnership, 188 B.R. 799, 809 (E.D. La. 1995); In re Walker, 165 B.R. 994, 1000 (E.D. Va. 1994).

Under Pennsylvania law, as instructed by the Third Circuit Court of
Appeals, a creditor is entitled to postjudgment interest at the statutory rate of 6%, rather
than the contract rate, unless the loan agreement provides otherwise. See In re Stendardo
991 F.2d 1089, 1094-96 (3d Cir. 1993). The promissory note, which contained the
confession of judgment provision relied upon by TRF in state court, does not contain any
language permitting postjudgment interest at the contract rate. See ex. TRF-4; TRF
Posthearing Memorandum, at 19 n.12.[5] Thus, for purposes of these two contested
matters, TRF now asserts that postjudgment, postpetition interest accrues at a per diem
rate of $710.46, and estimates that its allowed secured claim, including counsel fees, will
be $5,141,280.23 as of September 4, 2011. TRF Posthearing Memorandum, at 19.[6]

TRF's proposed plan, by including postpetition, preconfirmation interest (as
well as counsel fees) as components of its allowed secured claim, implicitly asserts that
TRF is an oversecured creditor entitled to apply the provisions of 11 U.S.C. § 506(b).
See generally United Savings Association of Texas v. Timbers of Inwood Forest
Associates, Ltd., 484 U.S. 365, 372-73 (1988); In re PPI Enterprises (U.S.), Inc., 324 F.3d
197, 205 n.14 (3d Cir. 2003); Matter of Southland Corp., 160 F.3d 1054 (5th Cir. 1998).
In other words, TRF contends that the value of the debtor's interest in the 3000-3050
Master Street property exceeds the amount of TRF's secured claim (and the secured
claims of those with liens with greater priority: viz., the City of Philadelphia). The

---

[5]TRF's memorandum states that there is different language in the mortgage
agreement, TRF Posthearing Memorandum at 19 n.12, but the mortgage agreement was not
offered into evidence. (TRF ex. 23 was withdrawn at the hearing.) Moreover, the judgment
obtained by TRF was not based upon the mortgage.

[6]Thus, TRF now implies that the amount asserted in its proof of claim is
inaccurate.

proposed plan calls for TRF, the only class 2 creditor, either to obtain the debtor's interest in 3000-3050 Master Street via credit bid, or to be paid in full its allowed secured claim, with interest, costs and fees under section 506(b), from the proceeds of sale to a third party.

Class 3 consists of the secured claims of Ms. McAlonan and the City of Philadelphia, with the collateral identified as the six small real estate parcels. The plan calls for the collateral to be transferred to Ms. McAlonan subject to the tax lien of the city.

Class 4 consists of general, non-priority unsecured claims. If TRF obtains the debtor's interest in 3000-3050 Master Street, then unsecured creditors will receive either a 30% dividend on their allowed secured claims or $203,321.76, whichever is less.[7] If the debtor's interest in this realty is transferred to a third-party purchaser, then unsecured creditors will receive a distribution from the net proceeds of sale, after payment of all administrative claims, costs and fees connected with the sale, and all allowed secured claims. As will be discussed below, the proposed plan is structured so that unsecured creditors will receive at least $203,321.76 from any third-party sale proceeds.

Class 5 consists of the secured tax claim of the City of Philadelphia on 3000-3050 Master Street. This claim is estimated at $74,000. The claim is to be repaid in full upon transfer of the realty, either by payment from TRF or from the proceeds of sale to a third-party purchaser.

---

[7]The claims register, ex. TRF-11, and the debtor's Bankruptcy Schedule F, reveal that there are a total of about $677,650 in non-contingent, liquidated, undisputed, unsecured claims. See generally Fed. R. Bankr. P. 3003(c)(2).

Class 6 consists of the equity security holders: viz., the limited and general partners. Those interests are eliminated under the plan and are to receive no distributions.

A major point of contention between TRF and the debtor concerns the proposed provisions for funding this plan, which provisions were significantly modified just prior to the confirmation hearing (owing, at least in part, to objections raised by the debtor).

Upon a final order confirming TRF's plan,[8] Axis Realty Partners will be engaged to market the debtor's portion of 3000-3050 Master Street and be entitled to a commission of 6%, contingent upon the sale occurring. Ex. TRF-8, ¶ 5.1. All offers must be made in writing within six months of the final order and cannot include any contingencies (including financing contingencies), except the contingency of clear title to the realty. A 10% cash deposit is required with any bid. Bidders will be informed of other bids, and will have one opportunity to increase their bids. Id., ¶ 5.2.

The proposed plan does not call for TRF to bid any cash for 3000-3050 Master Street. Instead, TRF will credit bid $2 million, and may increase its credit bid as frequently as it wishes. Ex. TRF-6, ¶ 6.1.[9]

---

[8] The plan definition of "final order" requires the resolution of all appeals. See ¶ 1.1.31.

[9] The proposed bidding procedure states:

> Subject to Court approval, the Debtor will sell the 3000-3050 Property to the Plan Proponent pursuant to Code § 1129 (b)(2)(A)(ii) and, as made applicable by Code § 1129 (b)(2)(A)(ii), Code §363(k). The Plan Proponent will credit bid $2,000,000.00 of its Secured Claim, but if a bid is made for the property in excess of $2,000.000, the Plan Proponent is permitted to increase the amount of its credit bid one or more times to the amount of its debt, which

(continued...)

10

This opportunity to increase its credit bid is illusory however, because the proposed plan requires that any valid third-party bid be sufficient to repay TRF's allowed secured claim in full, plus all administrative expenses, broker's commissions, fees to TRF's counsel connected with the sale, at least a 30% dividend to unsecured creditors holding allowed claims, and payment in full of the city's tax lien on this realty.  Ex. TRF-8, ¶ 6.1.  TRF's counsel stated at the hearing that, as of the date of the confirmation hearing, the minimum acceptable bid must be at least $6,229,570.00.  Using revised figures in its posthearing memorandum, TRF now estimates that any qualified third-party bid under its plan would need to exceed at least $5,805,355.85.  TRF Memorandum, at 20.  As this minimum acceptable third-party offer must exceed any allowed claim held by TRF, TRF cannot credit bid a greater amount than a valid third-party bid.

TRF and the City of Philadelphia voted to accept the proposed plan.  The class of unsecured creditors voted to reject it.  Ex. TRF-10.  And the class of equity interest holders is deemed to have rejected it.  See 11 U.S.C. § 1126(g).

C.

In support of its proposed plan, TRF offered evidence of its financial ability to repay the City of Philadelphia's outstanding tax lien on 3000-3050 Master Street and to

---

[9](...continued)
as of September 15,2010 is $5,165,401.59, plus continuing interest, costs and fees as reflected in the proof of claim filed by the Plan Proponent.

Ex. TRF-6, ¶ 6.1.

tender $203,321.76 to unsecured creditors holding allowed claims, plus its ability to pay

all quarterly fees owed to the United States Trustee under 28 U.S.C. § 1930(a)(6).  See 1

N.T. at 30-32; ex. TRF-25.

TRF also offered testimony from Mr. Edward J. DiMarcantonio, a principal

in Axis Realty Partners—the entity proposed by TRF to market and sell the debtor's realty

at 3000-3050 Master Street.  See ex. TRF-26.  If TRF's plan were confirmed and Axis

engaged, Axis would be paid a 6% commission upon sale of the realty.  Id., at 18

(unpaginated).  It proposes to market the realty as widely as possible, neither limiting

itself to real estate developers nor solely to those that would purchase as opposed to lease

the realty.  See id.

Mr. DiMarcantonio conceded that prospective buyers would need time to

perform "due diligence" and obtain an appraisal and financing, as any qualified offer

under the proposed plan is required to have no contingencies, except for clear title.  Thus,

a six month deadline for marketing and sale is "tight."  2 N.T. at 108.  Moreover, the

minimum bid that TRF believes is required under its proposed plan—now

$5,805,355.85—is about 83% of the initial asking price that Mr. DiMarcantonio would

suggest for 3000-3050 Master Street: $7 million.  2 N.T. at 125.

Finally, Mr. DiMarcantonio believes that loan financing to purchase and

develop the debtor's property is difficult to obtain at present.  Therefore, he opined that

an agreement by TRF to finance a third-party offer would significantly enhance the

marketability of the debtors' realty:

> The commercial financing markets have not recovered and
> will prohibit many buyers or tenants for financing for
> purchase or for tenant improvements.  If TRF financing could
> be available, this will greatly enhance the ability to attract

> prospects.  Financing is the number one issue in today's
> market.

Ex. TRF-26 at 10 (unpaginated).  TRF offered no evidence of any willingness to provide

financing to prospective third-party purchasers.


## II.


The debtor and TRF have submitted thoughtful posthearing memoranda.

Their respective positions may be summarized thusly.

The debtor seeks dismissal of its case, believing that upon dismissal, as the

bankruptcy stay will no longer be in place, <u>see</u> 11 U.S.C. § 362(c)(2)(B), the state court

will reissue its earlier ruling striking TRF's confessed judgment and staying any

execution.  As the debtor cannot challenge a state court judgment in this court, even one

entered by confession, <u>see</u>, <u>e.g.</u>, <u>FRG, Inc. v. Manley</u>, 919 F.2d 850 (3d Cir. 1990), it

contends that only dismissal will allow it to obtain a determination of the amount actually

owed to TRF.  Moreover, the debtor asserts that dismissal will allow it to obtain

refinancing, develop its property, pay all creditors the amounts they are owed, create

additional value for its limited partners, and enhance the attractiveness of a relatively

undeveloped section of the city.

TRF contends that the debtor, having voluntarily filed a bankruptcy petition

to stay the state court-scheduled execution sale, should not now be allowed to decide that

its filing was a mistake.  Rather, as the debtor has not proposed a chapter 11 plan despite

adequate time to do so, and has offered no evidence that it can obtain refinancing to

complete its renovation project, TRF should be permitted, through its proposed plan, to

13

market and sell the debtor's property, which proposal will pay unsecured creditors a reasonable dividend. It further maintains that, were dismissal to occur, the debtor would remain unable to find refinancing and would simply lose its properties in execution sales after litigation, resulting in no dividend to unsecured creditors.

Each party, as further support for its desired result, raises numerous challenges to the particular relief sought by its opponent. As will be discussed, the debtor contends that TRF's proposed chapter 11 plan fails to meet the requirements of section 1129, as well as notice requirements found in the procedural rules. TRF maintains that the debtor has proven no cause for relief under section 1112(b).

I shall first consider the issue of confirmation.

## III.

Confirmation of a chapter 11 plan requires that the plan proponent meet all the requirements of section 1129(a), see, e.g., In re Dupell 2000 WL 192972, at *3 (Bankr. E.D. Pa. 2000); In re Future Energy Corp., 83 B.R. 470, 481 (Bankr. S.D. Ohio 1988), except that if all the provisions of section 1129(a) are established, save those of subsection 1129(a)(8) (requiring every impaired class of claims or interests to accept the plan), then the plan proponent can seek confirmation under section 1129(b). See 7 Collier on Bankruptcy, ¶ 1129.02[8] (16th ed. 2010) ("The condition set forth in section 1129(a)(8) is the only condition precedent which is not absolutely necessary for confirmation. If a plan satisfies the confirmation criteria set forth in section 1129(a), including the requirement that if a class of claims is impaired, at least one impaired class

14

of claims accepts the plan, the plan may be confirmed notwithstanding the opposition of one or more impaired classes of claims or interests, provided the plan satisfies section 1129(b).").

       Here, there is no dispute that not every impaired class of creditors and interest holders has accepted TRF's proposed chapter 11 plan.  The unsecured creditor class, Class 4, voted against the plan.  And the equity interest holders are deemed to oppose the plan.  Thus, TRF seeks confirmation under section 1129(b)—the fair and equitable provision.  See generally In re Armstrong World Industries, Inc., 432 F.3d 507, 509-10 (3d Cir. 2005).

       The debtor's objections to confirmation largely, although not completely, fall into two categories.  First, the debtor contends that TRF did not provide enough notice when it twice modified its proposed amended plan shortly before the confirmation hearing.  Second, the debtor maintains that TRF's proposed plan has not been proposed in good faith as required by section 1129(a)(3).

       The debtor's complaints about insufficient notice are unpersuasive.  The modifications to the proposed plan were made after creditor voting occurred and were limited to improving creditor and administrative expense distributions, as well as to increase the marketing period for soliciting third-party bidders for 3000-3050 Master Street.  TRF did not request additional voting on its modifications.  See Fed. R. Bankr. P. 3019(a).[10]

---

[10]Rule 3019(a) provides:

(a) Modification of plan before confirmation

(continued...)

Thus, TRF seeks confirmation of its second modified amended plan with the only classes supporting the proposed plan being Class 2 (the TRF class) and Classes 3 and 5 (City of Philadelphia classes). Counsel for the city appeared at the confirmation hearing and expressly stated that the proposed modifications had been reviewed and are acceptable to the city. It did not wish to change its vote. And certainly, TRF would not change its vote in support of its own plan. The United States trustee, through her counsel, stated her position regarding support of dismissal and neutrality as to confirmation with knowledge of TRF's modifications.

Accordingly, except to the extent that the plan modifications attempted to address certain objections to the amended TRF plan that had been raised by the debtor, the debtor's interests, insofar as the confirmation process is concerned, have not been adversely affected by the lack of additional notice. To the extent that the debtor has standing to raise its notice issues, see generally, In re Mount Carbon Metropolitan Dist., 1999 WL 34995477, at *6 (Bankr. D. Colo. 1999) ("Most courts conclude that parties may not object to confirmation of a plan based upon interests of parties who have accepted it. . . ."), those objections cannot be sustained.

--------

[10](...continued)
In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

16

Insofar as the debtor's argument regarding good faith is concerned, I conclude that this objection requires an analysis of the "fair and equitable" standard imposed by section 1129(b) as well as section 1129(a)(3).

Recognizing that "good faith" under section 1129(a)(3) is not defined, the Third Circuit has adopted the Seventh Circuit's definition:

> ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."). The purpose of requiring such a finding in each situation, however, is quite similar: it prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11.

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986) (quoting Matter of Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir.1984)); see In re Combustion Engineering, Inc., 391 F.3d 190, 247 (3d Cir. 2004); In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000).  A former colleague rephrased this statutory requirement thusly:

> Stated another way, "'[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of 1129(a)(3) is satisfied.'"  Matter of T-H New Orleans Ltd. Partnership, 116 F.3d 790, 802 (5th Cir. 1997) (quoting In re Sun Country Dev. Inc., 764 F.2d 406, 408 (5th Cir. 1985)).  A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable. Matter of Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1167 (5th Cir. 1993).  Bad faith, on the other hand, has been found where there is no realistic possibility of reorganization and the debtor seeks merely to frustrate efforts of secured creditors. United Marine, 197 B.R. at 947 (citing In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984)).

In re Frascella Enterprises, Inc., 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

17

In applying section 1129(a)(3), "[t]he requisite good faith determination is based on the totality of the circumstances." In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002). In reviewing TRF's plan as modified, I conclude that it meets this general standard of good faith.

The debtor also contends that no impaired class of claims has voted in favor of the proposed plan, and so the provisions of section 1129(a)(10) have not been met. In general, "[t]he [Bankruptcy] Code treats a claim as impaired unless the plan leaves in place all rights to which the claim entitles its holder, except for certain rights to accelerate payments after default." In re DBSD North America, Inc., 634 F.3d 79, 89 n.4 (2d Cir. 2011). "If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely 'unaltered,' the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code." In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 202 (3d Cir. 2003).

Neither TRF's nor the city's secured claim in the 3000-3050 Master Street property is left entirely unaltered by TRF's proposed plan. Both must wait at least six months to receive any plan distribution. And TRF may receive the realty, rather than cash payment in full on the effective date, plus be required to tender payments to unsecured creditors and pay administrative expenses. Thus, both creditors' claims are impaired within the broad meaning of section 1124. See In re L & J Anaheim Associates, 995 F.2d 940, 943 (9th Cir. 1993) (proposed auction sale impaired rights of secured creditor); In re Atlantic Terrace Apartment Corp. 226 B.R. 535, 538 (Bankr. E.D.N.Y. 1998); In re Union Meeting Partners, 160 B.R. 757, 770-71 (Bankr. E.D. Pa 1993).

18

As the only claim placed in Class 5, the city's affirmative vote means that this impaired class has approved the proposed plan. See 11 U.S.C. § 1126(b). Moreover, even though TRF is the plan proponent, TRF is not considered an "insider" within the meaning of sections 101(31) and 1129(a)(10). Therefore, as the only member of class 2, its affirmative vote means that impaired Class 2 has approved the plan. See, e.g., In re L & J Anaheim Associates, 995 F.2d at 942-43 (affirmative vote of plan proponent meets the requirements of section 1129(a)(10)); In re Union Meeting Partners, 160 B.R. at 772 (same).[11]

Accordingly, TRF has met the requirements of section 1129(a)(10).

Believing that the requirement of section 1129(a)(10) was not established, the debtor did not expressly address the provisions of section 1129(b). It did clearly argue, in the context of a lack of good faith under section 1129(a)(3), that TRF will receive far more than it is entitled to receive as a secured creditor under its proposed second modified amended plan. Debtors' Memorandum at 18-19. This purported lack of fairness by TRF's plan is more properly considered within the scope of section 1129(b).

---

[11]The city's Class 5 vote alone would be sufficient to meet the requirements of section 1129(a)(10). Moreover, although TRF and the city both hold lien claims against 3000-3050 Master Street, it was probably correct to place their claims in different classes, as the city's lien holds a statutory priority over TRF's lien. See, e.g., In re Dilts, 126 B.R. 470, 471-72 (Bankr. W.D. Pa. 1991); In re Richard Buick, Inc., 126 B.R. 840, 853 (Bankr. E.D. Pa 1991) ("In light of the terms of § 1122(a), many courts have concluded that secured creditors may not be classified together when they have liens in different property, or possess liens of different priority in the same property, since their respective legal rights are not substantially similar."); see generally Matter of Bugg, 172 B.R. 781 (E.D. Pa. 1994); 7 Collier on Bankruptcy, ¶ 1122.03[3][c] (16th ed. 2010) ("[A]s a general rule each holder of an allowed claim secured by a security interest in specific property of the debtor should be placed in a separate class."). However, had they been placed in the same class, that class would be impaired and would have voted in favor of the proposed plan, thereby meeting the requirements of section 1129(a)(10), even if TRF were considered an insider.

IV.

      As explained by the Supreme Court, one aspect of the "fair and equitable"

standard is the "absolute priority rule":

> As to a dissenting class of impaired unsecured creditors, such
> a plan may be found to be "fair and equitable" only if the
> allowed value of the claim is to be paid in full, §
> 1129(b)(2)(B)(i), or, in the alternative,  if "the holder of any
> claim or interest that is junior to the claims of such [impaired
> unsecured] class will not receive or retain under the plan on
> account of such junior claim or interest any property," §
> 1129(b)(2)(B)(ii).  That latter condition is the core of what is
> known as the "absolute priority rule."

Bank of America National Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership,

526 U.S. 434, 441-42 (1999).

      The second modified amended plan proposed by TRF does not mandate

payment in full of all allowed unsecured claims.  It, however, also does not provide for

any distribution to equity interests, which interests are junior to the claims of unsecured

creditors.  In that respect, the absolute priority rule is not violated by this proposed plan:

> [T]he pre-Code judicial response known as the absolute
> priority rule [held] that fairness and equity required that "the
> creditors . . . be paid before the stockholders could retain
> [equity interests] for any purpose whatever." Northern Pacific
> R. Co. v. Boyd, 228 U.S. 482, 508 . . . (1913).  See also
> Louisville Trust Co. v. Louisville, N.A. & C.R. Co., 174 U.S.
> 674, 684 . . . (1899) (reciting "the familiar rule that the
> stockholder's interest in the property is subordinate to the
> rights of creditors; first of secured and then of unsecured
> creditors," and concluding that "any arrangement of the
> parties by which the subordinate rights and interests of the
> stockholders are attempted to be secured at the expense of the
> prior rights of either class of creditors comes within judicial
> denunciation").

Id., 526 U.S. at 444-45 (citations omitted).

20

Nevertheless, courts have recognized another aspect of the absolute priority rule. "Courts have decided that 'a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.'" In re Exide Technologies., 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del. 2001)).

As explained more fully in In re MCorp Financial, Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992), appeal dismissed, 139 B.R. 820 (S.D. Tex. 1992):

> Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of § 1129(b) in the House report, were omitted from the House amendment "to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class." For example, a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims. While that requirement was explicitly included in the House bill, the deletion was intended to be one of style and not one of substance. The safeguards that no claim or interest receive more than 100 percent of the allowed amount of such claim or interest and that no class be discriminated against unfairly will insure that the plan is fair and equitable with respect to the dissenting class of interests. See 5 Collier on Bankruptcy, ¶ 1129.03, p. 1129-56 and 1129-60 (15th ed. 1991) quoting the remarks of the sponsors of Pub.L. No. 95-598 describing § 1129(b).
>
> Thus, in applying the "fair and equitable" standard contained in § 1129(b), the court need only determine that no class senior to the dissenting class will receive more than full compensation for its claims or interests and that members of the dissenting class either receive full compensation for their claims or interests or no junior class receives any distribution or retains any interest after confirmation of such plan. 5 Collier on Bankruptcy, ¶ 1129.03, p. 1129-94 (15th ed. 1991).
>
> If former stockholders' interests are eliminated, a valuation is required to make sure that the senior classes of claims are not being provided for more than in full. If former shareholders' interests are impaired and a class of creditors is provided for

21

more than in full, the plan will not be confirmed.  Conversely,
for a plan to be confirmed when stockholders are eliminated,
creditors must not be provided for more than in full.  See, e.g.,
Klee, All You Ever Wanted to Know About Cram Down
Under the Bankruptcy Code, 53 Am. Bankr. L.J. 133, 148,
149, 166 (1979); see In re Future Energy Corp., 83 B.R. 470,
at 495 (Bankr. S.D. Ohio 1988) wherein that court rejected
the argument made by the debtors here, and held that the
overpayment of senior creditors is violative of the fair and
equitable standard; In re Walat Farms, Inc., 70 B.R. 330, 335
(Bankr. E.D. Mich. 1987).

Id., 137 B.R. at 235 (paragraph numbers omitted); see also Kipperman v. Onex Corp.,

411 B.R. 805, 875 (N.D. Ga. 2009).[12]

Thus, "[i]t's undisputed that the 'fair and equitable' requirement

encompasses a rule that a senior class cannot receive more than full compensation for its

claims.  Courts will deny confirmation if a plan undervalues a debtor and therefore would

have resulted in paying senior creditors more than full compensation for their allowed

claims."  In re Chemtura Corp., 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010); In re Granite

Broadcasting Corp., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that

a class of creditors cannot receive more than full consideration for its claims, and that

excess value must be allocated to junior classes of debt or equity, as the case may be.").

At bottom, the debtor asserts that TRF's plan, if approved, will result in that

creditor obtaining ownership of real estate worth at least $8 million simply by making a

credit bid of only $2 million, tendering about $203,000 to unsecured creditors and paying

_____

[12]One could view this "corollary" to the absolute priority rule as analogous to 11
U.S.C. § 1129(a)(7)(A)(ii): dissenting creditors and equity interest holders must receive under a
confirmed plan no less than they would receive in a hypothetical chapter 7 liquidation.  See
generally Tripp v. Prock, 865 F.2d 265 (Table), 1988 WL 131640 (9th Cir. 1988).  If senior
creditors are overpaid, then either junior creditors or equity holders—the latter entitled to any
surplus under section 726(a)(6) after creditors are paid in full—will be undercompensated.

administrative expenses. Moreover, the debtor complains, not only will TRF obtain this real estate for one-fourth its actual value, but TRF could possibly seek additional funds from the loan guarantors. See generally New England Coal & Coke Co. v. Rutland Co., 143 F.2d 179, 186 (2d Cir.1944) ("A plan may be feasible and yet be not fair and equitable; thus if a reorganization plan for a railroad, with assets worth $15,000,000 and debts of $11,500,000, were to provide for the issuance of nothing but common stock having an aggregate par value of $10,000,000, all to be distributed to the old creditors, the plan would clearly be feasible and fully protective of the public interest in the railroad's services, but it would be wanting in fairness.") (footnote omitted).

Indeed, as the debtor suggests, under Pennsylvania law which governs the TRF loan agreement, were TRF to obtain title to 3000-3050 Master Street for a credit bid of $2 million based upon a claim of approximately $5 million, TRF would probably be able to assert a deficiency claim against the loan guarantors, who are the limited partners of the debtor. Pennsylvania's Deficiency Act, 42 Pa. C.S.A. § 8103(a), which would normally protect loan guarantors from a deficiency claim based upon a less than fair market value credit bid, may not be applicable in these circumstances.

Pennsylvania's Deficiency Act provides:

> Whenever any real property is sold, directly or indirectly, to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due on said judgment, interest and costs, the judgment creditor shall petition the court to fix the fair market value of the real property sold.

(emphasis added).

23

If I assume that this statute remains valid, see Home Savings and Loan Co. v. Irongate Ventures, LLC., 2011 WL 1331544, at *1 n.2 (Pa. Super. 2011) (that issue is currently under consideration by the Pennsylvania Supreme Court), the Deficiency Judgment Act can be asserted when a creditor seeks to recover from a guarantor after disposition of property via an execution sale.  See generally Confederation Life Insurance Co. v. Morrisville Properties, L.P., 715 A.2d 1147 (Pa. Super. 1998).  In Wedgestone Financial v. Pullman, 1992 WL 2226 (E.D. Pa. 1992), however, the district court held that a bankruptcy sale pursuant to 11 U.S.C. § 363 was not an "execution proceeding," thereby rendering the Deficiency Judgment Act inapplicable.  As a result, the creditor in that instance was permitted to seek recovery of the difference between the amount of its judgment and the amount of its lesser credit bid.

Similarly, a sale of property pursuant to the terms of a confirmed plan, as permitted by 11 U.S.C. §§ 1123(a)(5)(D), (b)(4) and 1129(b)(2)(A)(ii), may not be considered an execution proceeding within the meaning of Pennsylvania law.  If so, and if TRF obtains the realty for a $2 million credit bid plus other plan distributions, the guarantors may be liable for any loan deficiency without the aforementioned statutory protection.

The debtor's confirmation objection assumes, however, that to be "fair and equitable" TRF's proposed plan must provide the disposition of the debtor's real property in a method that will achieve fair market value.[13]  As the Supreme Court has explained in

---

[13]I appreciate that no unsecured creditor has objected to TRF's proposed plan. Thus, if the objection raised by the debtor were only that unsecured creditors were not receiving all of the equity in the realty located at 3000-3050 Master Street to which they are entitled, the debtor would be without standing to do so.  However, given the amount of unsecured claims in

(continued...)

the context of a constructive fraudulent conveyance, the Bankruptcy Code does not always require such a result.  BFP v. Resolution Trust Corp., 511 U.S. 531 (1994).

To achieve fair market value for the debtor's real property located at 3000-3050 Master Street, the evidence suggests that one may need up to two years of marketing in order to take into account current lending conditions and the need for their improvement.  Implicitly, TRF counters that when a debtor files a voluntary petition in bankruptcy under chapter 11, fails to tender any postpetition payments to its mortgagee, and fails to propose a chapter 11 plan, fairness and equity may not require that the mortgagee propose a plan that calls for such extensive marketing.

TRF does not suggest, however, that any marketing proposed by the mortgagee is inherently fair and equitable.  Thus, where, as here, TRF—before its latest modification—proposed a plan that provided for three days of newspaper advertisements with only five business days thereafter for third-party bids, ex. TRF-6, ¶¶ 5.1, 5.2, one might well conclude (as TRF apparently did when it modified its amended proposed plan) that such marketing was much too brief to be fair and equitable.  See generally In re Blixseth, 2010 WL 716198 (Bankr. D. Mont. 2010) (proposed bidding procedures were unfair).

---

[13](...continued)
this case, the debtor's objection implies that equity holders are also being underpaid by the proposed plan.  Parties "have standing only to challenge those parts of a reorganization plan that affect their direct interests."  In re Evans Products Co., 65 B.R. 870, 874 (S.D. Fla. 1986); see, e.g., In re Congoleum Corp., 414 B.R. 44, 56-57 (D.N.J. 2009); In re Patrician St. Joseph Partners Ltd. Partnership, 169 B.R. 669, 682 (D. Ariz. 1994).  Upon liquidation of the debtor partnership assets, any surplus after payment to unsecured creditors would be paid to the debtor for distribution to its limited partners.

A confirmation objection posed by the debtor is whether TRF's currently proposed six-month marketing period will produce a fair and equitable result on these facts. "[S]ection 1129(b)(2) explicitly defines the term 'fair and equitable' as merely including the general requirements listed in the Code and expressly leaves room for additional factors to be considered in applying the principle in other particular circumstances." In re Bonner Mall Partnership, 2 F.3d 899, 912 (9th Cir. 1993). In deciding that question, I must consider not only the marketing period but the bidding procedures as well.

Based upon the evidence presented, it is highly probable that no qualifying bid—viz., a bid by TRF's estimate that must exceed $5.8 million—will be obtained during the proposed six-month marketing period.

First, TRF's expert appraiser opined that third parties in this marketing period will be likely to value the realty at between $5 million and $6 million, but only as a mixed-use condominium development. Other uses would result in a lower valuation. 1 N.T. at 152. Such development would require, by the debtor's estimate, up to $20 million in addition to the cost of purchasing the realty. Thus, within six months, a prospective bidder, without the protection of any contingencies in its offer, would need to obtain at least $5.8 million to render a qualifying bid, but also be confident that it can obtain financing for future renovations. TRF's appraiser (as well as Axis Realty) testified that finding financing for condominum development in the current local real estate market is very difficult. 1 N.T. at 151 ("[T]here's no financing available for condominium projects."). As a result, she opined that a bid of "[$]5.5 million would be a very

26

optimistic value if there was—if they were unable to get financing, you're going to be

looking at somebody who's a bottom fisher, basically." 1 N.T. at 151.

Indeed, TRF's appraiser elaborated on the need for financing just to reach

her $5 million to $6 million valuation:

> A.  I think that what I meant to say, if I didn't say it, was that
> if TRF was to provide financing and stay in the deal, then that
> 5.5- to 6-million-dollar range would probably be realistic.
> But if not, then you're looking at somebody who's gonna say,
> you know, what can I do with this in the short term?  How
> much money can I get?  It's not gonna be nearly as much.  So
> I think that to get the best price in a short period of time,
> there's gonna need to be financing available.  Without
> financing, you're gonna get a lower price.
>
> Q. An[d] absent TRF providing the financing, is there anyone
> else out there that can do so for this project?
>
> A. Not — I don't think there's anybody else out there for a
> condominium project.  I mean, it may be that there's — there
> would be private equity investors that would be interested, but
> I think this location and all the other aspects of it would make
> it pretty risky for that kind of a development.  There might be
> financing for the building under another use, but it would not
> be nearly as much.  It would probably be a fraction of the
> purchase price.  There are, you know, there are lenders out
> there who are lending at 50% of the value.  That still means
> that somebody has to come with a lot of money for a down
> payment.  And I would qualify, again, that would not be on a
> proposed condominium project.

1. N.T. at 152-53.

In her testimony, TRF's executive vice president did not mention any

willingness to finance a third-party purchaser of this realty.  Such unwillingness is not

surprising, as TRF has been involved with the debtor's project for approximately ten

years and expected to be repaid years ago.  With condominium development financing,

there may or may not be bidding in excess of $5.8 million.  Without such financing, any

bids, according to the professionals who testified, are almost certain to be lower.

 In the likely event that no qualifying bid is made, after confirmation TRF

would obtain title to the realty based solely upon its $2 million credit bid.  TRF does not

agree with the debtor that 3000-3050 Master Street has a value of $8 million: its proposed

plan, however, does posit that this property has a value of more than $5 million.  As a

result, this equity entitles the creditor to benefit from the postpetition interest, costs and

fees provisions of section 506(b).  Furthermore, as mentioned earlier, absent any qualified

bids not only would TRF obtain title to the realty for its $2 million credit bid (plus

creditor payments), it may also be able to assert a deficiency claim against the loan

guarantors under Pennsylvania law.

Accordingly, upon consideration of the proposed plan provisions calling for

the disposition of the debtor's interest in the 3000-3050 Master Street realty, I agree with

the debtor that the proposed plan, if approved, would very probably overpay TRF's

allowed secured claim to the detriment of classes with lower priority, including the equity

security holders.  Thus, the proposed plan is not "fair and equitable" under section

1129(b).  It cannot be confirmed over the debtor's opposition.


V.


I turn next to the debtor's request for dismissal relief.


28

At the request of a party in interest,[14] section 1112(b)(1) of the Bankruptcy

Code grants a bankruptcy court the authority to dismiss a chapter 11 case or convert it to

one under chapter 7, "whichever is in the best interests of creditors and the estate, if the

movant establishes cause . . . ." 11 U.S.C. § 1112(b). The term "cause" is not defined by

the statute; the examples provided by subsection 1112(b)(4) are meant to be nonexclusive.

See, e.g., In re Gilroy, 2008 WL 4531982, at *4 (B.A.P. 1st Cir. 2008) ("Section

1112(b)(4) provides a nonexclusive list of what constitutes cause."); In re Broad Creek

Edgewater, LP, 371 B.R. 752, 759 n.8 (Bankr. D.S.C. 2007) ("Section 1112(b)(4)

contains a nonexclusive list of sixteen scenarios which constitute cause."); see also In re

Brown, 951 F.2d 564, 572 (3d Cir. 1991); Hall v. Vance, 887 F.2d 1041, 1044 (10th Cir.

1989).

Therefore, factors other than those expressly enumerated in the statute may

be considered, and the bankruptcy court has the discretion to reach the appropriate result

in a particular case. See, e.g., In re American Capital Equipment, LLC, 296 Fed. Appx.

270, 272 (3d Cir. 2008) (non-precedential); In re PPI Enterprises (U.S.), Inc., 324 F.3d

197, 211 (3d Cir. 2003). Generally, a court should consider the "totality of the

circumstances" in considering relief under section 1112(b). See Perlin v. Hitachi Capital

America Corp., 497 F.3d 364, 372 (3d Cir. 2007).

If cause for relief under section 1112(b) is demonstrated, and if the

provisions of section 1112(b)(2) are inapplicable (i.e., "unusual circumstances"), a court

---

[14]For purposes of section 1112(b)(1), a debtor is a party in interest. See, e.g., In re
Forum Health, 2011 WL 1134323, at *5 (Bankr. N.D. Ohio 2011); In re TCR of Denver, LLC,
338 B.R. 494 (Bankr. D. Colo. 2006).

should thereafter determine whether dismissal or conversion is more appropriate.  See,

e.g., In re Superior Siding & Window, Inc., 14 F.3d 240, 242 (4th Cir. 1994) ("A motion

filed under this section invokes a two-step analysis, first to determine whether 'cause'

exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding,

and second to determine which option is in 'the best interest of creditors and the

estate.'"); In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 798 (E.D.

Pa. 2000); In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991).[15]

Whether "cause" exists under section 1112(b) in a particular instance and, if

so, whether conversion or dismissal is more appropriate, are questions left to the sound

discretion of the bankruptcy court; in so concluding, a court need not provide an undue

elaboration of its reasoning.  See In re Superior Siding & Window, Inc., 14 F.3d at 242;

Matter of Koerner, 800 F.2d 1358, 1368 (5th Cir. 1986); In re Nardi, 1991 WL 255681, at

*2 (E.D. Pa. 1991); In re Integrated Pet Foods, Inc., 2004 WL 2252119, at *8 (Bankr.

E.D. Pa. 2004).  One effect of this statutory provision is that it ensures that the bankruptcy

court has the power to administer promptly chapter 11 cases upon its docket.  See

generally In re Timbers of Inwood Forest, Ltd., 808 F.2d 363 (5th Cir. 1987), aff'd, 484

U.S. 365 (1988).

Many of the grounds expressly identified in section 1112(b)(4) may not

apply when a chapter 11 debtor seeks voluntary dismissal.  See In re Forum Health,

2011 WL 1134323, at *5 (Bankr. N.D. Ohio 2011) ("Each of the examples of cause in §

1112(b)(4) is based on some kind of failure by a debtor.  In other words, these are

---

[15]No party in interest suggests that the appointment of a chapter 11 trustee or the
appointment of an examiner is warranted.  See 11 U.S.C. § 1112(b)(1).

30

examples of cause that a party other than a debtor would usually cite as grounds for

dismissal.") (emphasis omitted).  Moreover, since a chapter 11 debtor has no statutory

right to dismiss its case comparable to section 1307(b) in chapter 13 cases, it may not be

appropriate to dismiss a case on the debtor's request when, for example, a chapter 11

debtor argues that dismissal is warranted because of some willful failure on its part that is

expressly identified in section 1112(b)(4).

       Therefore, when considering a chapter 11 debtor's motion for relief under

section 1112(b), some courts have focused upon factors such as whether the valid purpose

of chapter 11—reorganization (or liquidation) to maximize the value of the estate or

preserve going concern value, see, e.g., In re Integrated Telecom Express, Inc., 384 F.3d

108, 120 (3d Cir. 2004), cert. denied, 545 U.S. 1110 (2005)—no longer exists or can be

better achieved outside the chapter 11 context.  For example, because of postpetition

actions there may no longer be any business to reorganize, or there may be a lack of assets

to administer, in chapter 11; there may have been a material change in circumstances

postpetition such that confirmation of a chapter 11 plan is no longer possible; the

legitimate purpose intended by the debtor's chapter 11 bankruptcy filing may have been

achieved through settlement of litigation; or all interested parties may agree that

continuation of the chapter 11 case is not in their respective best interests.  See, e.g., In re

Gonic Realty Trust, 909 F.2d 624, 625 (1st Cir. 1990); In re Forum Health, 2011 WL

1134323, at *6; In re Gateway Ethanol, L.L.C., 2011 WL 597059, at *1 (Bankr. D. Kan.

2011); In re OptInRealBig.com, LLC, 345 B.R. 277, 282 (Bankr. D. Colo. 2006).

31

If cause for relief under section 1112(b) is demonstrated, whether dismissal or conversion is more appropriate requires consideration of the differing effects upon interested parties.

Here, the debtor argues that it is unable to file a viable chapter 11 plan because it has been unable to obtain refinancing. It asserts, however, that were this bankruptcy case dismissed its opportunity to obtain refinancing would be much improved, which would inure to the benefit of its secured and unsecured creditors. It further contends that dismissal would allow it to contest TRF's confessed judgment thereby reducing that creditor's claim to a proper amount, which challenge is likely to be successful given the postpetition ruling of the state court (albeit in violation of the bankruptcy stay) that struck that judgment. See also In re Turboff, 120 B.R. 849 (Bankr. S.D. Tex. 1990) (voluntary dismissal granted after substantial state court judgment against the debtor was reversed on appeal).

The United States trustee supports the debtor's request for dismissal. She has filed her own motion seeking such relief, noting that the case has been pending long enough without any confirmed plan, the debtor does has not have funds to pay postpetition obligations, and dismissal will end the bankruptcy stay, permitting creditors to exercise their non-bankruptcy law rights against the debtor.

The City of Philadelphia has no opposition to granting relief under section 1112(b). "The City is not opposed to the confirmation plan or to a dismissal of the case." 3 N.T. at 58. Moreover, it has no preference as to either result. Id.

The sole opposition to dismissal comes from TRF. This creditor contends that there is no persuasive evidence that the debtor will be able to obtain refinancing were

32

this case dismissed, unsecured creditors are unlikely to be repaid in any amount if

dismissal occurs, and it has proposed a viable chapter 11 plan.  In the alternative, TRF

perfers conversion over dismissal.

Upon consideration of all of the circumstances, I am persuaded by the

position articulated at the outset of the consolidated hearing by counsel to the United

States trustee:

> [The United States trustee] supports dismissal of the case.  If
> the Court does not confirm [TRF's proposed plan], we think
> the proponent has had sufficient time to present the best Plan
> that it has, that there should not be another opportunity for
> any party to propose another Plan.  And if that's the case, we
> think the first component of 1112(b) will be satisfied, and
> that's to say the Debtor should not remain in Chapter 11 any
> further.  Saying that, with respect to the second prong of
> 1112(b), we think it would be appropriate that the Court
> would dismiss the case, and that Creditors may take whatever
> rights — or they have whatever rights and may take whatever
> remedies that are available to them in State Court.

1 N.T. at 6.

All agree that the chapter 11 debtor is unable to propose a viable plan.  I

further conclude that TRF has had ample opportunity to do so, and proposed a second

modified amended plan (i.e., its fourth proposed plan).  That latest plan contained

provisions considered important to protect the interests of TRF, but ultimately rendered

the proposed plan unconfirmable, for reasons just stated.  No other party in interest has

expressed any desire to propose its own plan.  I agree with the United States trustee that,

given the totality of circumstances, no additional time and expense should be incurred in

the chapter 11 confirmation process in this case.  Therefore, cause for relief under section

1112(b) exists.  See Matter of Woodbrook Associates, 19 F.3d 312, 322 (7th Cir. 1994)

("[B]ankruptcy courts are given a great deal of discretion to say when enough is enough.").

As between conversion and dismissal, conversion to chapter 7 should only be considered if a chapter 7 trustee would have assets to administer upon conversion. See, e.g., In re Quail Farm, LLC, 2010 WL 1849867, at *7 (Bankr. N.D.W. Va. 2010) (dismissal is more appropriate than conversion as "the value of the real property—the sole asset of the bankruptcy estate—is insufficient to satisfy the secured claims of the Quallses and DRB. Thus, there are no assets in the estate for a Chapter 7 Trustee to administer thereby making administration of the case in a Chapter 7 context imprudent and unnecessary."); In re FRGR Managing Member LLC, 419 B.R. 576, 585 (Bankr. S.D.N.Y. 2009) ("Where there are few if any assets to administer, and the estate appears to be administratively insolvent, dismissal would often be the better course."); In re 3 Ram, Inc., 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Since Ram has only one asset which is fully encumbered, there is no estate for a Chapter 7 trustee to administer. Thus, dismissal as opposed to conversion is indicated.").

The evidence presented—the debtor has no cash for a chapter 7 trustee to use—reflects that there are only real estate assets of this bankruptcy estate.[16]  The six small properties, valued on the debtor's schedules at $100,000, appear to be fully encumbered by liens held by the City of Philadelphia and Ms. McAlonan. As for the larger property, the lack of available financing in the market place makes it unlikely that a trustee would attempt to sell the realty with a reasonable expectation of providing any

---

[16]There was no suggestion that preference or fraudulent conveyance actions would be available to a chapter 7 trustee.

34

dividend to unsecured creditors.  Thus, all the property would likely be abandoned by the

trustee.  See generally In re K.C. Machine & Tool Co., 816 F.2d 238 (6th Cir. 1986); In re

Rambo, 297 B.R. 418, 433-34 (Bankr. E.D. Pa. 2003); In re Tobin, 202 B.R. 339 (Bankr.

D.R.I. 1996).  Accordingly, I conclude that it would not be in the best interests of

creditors and the debtor to convert this case.  See also In re Lacy, 304 B.R. 439 (D. Colo.

2004) (bankruptcy court abused its discretion in converting a chapter 11 case to one under

chapter 7 when there would be no assets for a chapter 7 trustee to administer).

        As for dismissal, unsecured creditors have not participated in this case and

failed to support TRF's liquidating plan proposal.  The City of Philadelphia, which by

statute holds a first lien on all of the debtor's realty, see 53 P.S. § 7102; see also 2 Ladner

on Conveyancing in Pennsylvania, § 12.09(d) (4th ed. rev. 1979) (property tax liens prime

all mortgage liens), does not oppose dismissal.  Another secured creditor, Ms. McAlonan,

also has not participated and appears to be content to exercise her state law rights as

lienholder.  TRF has ample rights under state law as mortgagee and judgment

creditor/plaintiff, which rights it too can exercise upon dismissal.

        To a large extent, this bankruptcy case has become a two-party dispute

between TRF and the debtor.  That dispute can be fairly adjudicated in the state court

system.  Accordingly, dismissal of this case is warranted.  However, I shall exercise my

discretion in granting the debtor's request for voluntary dismissal, to insure that any

subsequent bankruptcy petition by the debtor is filed in good faith and not merely for

purposes of delay: the debtor will be barred from future bankruptcy filings absent prior

court approval.  See 11 U.S.C. § 105(a) (the Bankruptcy Code version of the All Writs

Act, 28 U.S.C.A. § 1651(a)); In re Casse, 198 F.3d 327, 339 (2d Cir. 1999); Haines v.

35

Miller, 2004 WL 1987218 (E.D. Pa. 2004); In re Hamer, 2000 WL 1230496, at *6 (E.D.

Pa. 2000); In re Narod, 138 B.R. 478, 484 (E.D. Pa. 1992); see generally In re Reilly, 112

B.R. 1014, 1017 (B.A.P. 9th Cir. 1990).

     An appropriate order will be entered consistent with this memorandum.


_____
BRUCE FOX
United States Bankruptcy Judge


Dated: April 29, 2011